# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JORGE LUIS CONCEPCION,**

　　　　**Plaintiff,**

　　　　　　　　　　　　　　　　　　**Case No. 6:08-cv-2130-Orl-35GJK**

**v.**

**DENIS DOWD, et al.,**

　　　　**Defendants.**

_____

## ORDER

This case is before the Court on Defendants' Motion for Summary Judgment (Doc. 75, filed September 24, 2010); Plaintiff's Amended Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 87, filed November 29, 2010); and Defendants' Reply to Plaintiff's Amended Response to Defendants' Motion for Summary Judgment (Doc. 91, filed December 30, 2010). After reviewing the summary judgment record, including the pleadings, exhibits, and documents submitted by both parties in support of their positions, the Court finds that Defendants Denis Dowd, Wm. Michael Bibb, Mark Stroop and Yuberky Almonte are entitled to summary judgment on Plaintiff's claims as a matter of law.

**I.　　Claims**

Plaintiff, a prisoner in the State of Florida, filed this action pursuant to 42 U.S.C. § 1983, alleging claims against six defendants ("Defendants") in their individual capacities: Osceola County Jail Sergeant Yuberky Almonte, Osceola County Jail Director Denis Dowd, Osceola County Jail Security Administrator Michael Bibb, Osceola County Jail Assistant Director Joyce Peach, Osceola County Jail Classification Manager Mark Stroop, and

Jane/John Doe (Doc. 1 at 7-10).[1]  Each claim arises from an incident which occurred on July 27, 2007, while Plaintiff was a pre-trial detainee at Osceola County Jail.   Petitioner was stabbed in the scalp with a pencil by fellow inmate, Eduardo Sanchez ("Sanchez") and chemical agents were sprayed into Plaintiff's eyes in order to restrain Plaintiff and Sanchez. *Id.* at 16.  Petitioner alleges Defendants violated his Fourteenth Amendment rights by failing to protect him from Sanchez.

In his claim against defendant Yuberky Almonte ("Almonte"), Plaintiff alleges that Almonte failed to take reasonable steps to prevent the attack by Sanchez despite being subjectively aware of the danger Sanchez posed to Plaintiff through his association with inmate Sharif Silva ("Silva").   In particular, Plaintiff alleges that Almonte inadequately investigated an incident in which Plaintiff claimed to have been escorted by a prison guard to the cell of co-defendant and fellow inmate, Silva, where a verbal altercation, including a death threat against Plaintiff, occurred (Doc. 87 at 3).   Plaintiff alleges that Almonte subsequently received an inter-office memo stating that Silva had been overheard talking with other inmates about killing Plaintiff.  Plaintiff alleges that Almonte's failure to act on the basis of this information constituted deliberate indifference.

In his claim against defendant Mark Stroop ("Stroop"), Plaintiff alleges that Stroop, who was in charge of housing, classifying, and re-housing inmates from different units and classification levels at Osceola County Jail, improperly classified Plaintiff and did not provide him adequate protection (Doc. 1 at 9). Petitioner alleges that Stroop ignored a serious risk of

---

[1]Defendant Peach was dismissed from this action pursuant to this Court's March 3, 2010 order (Doc. 44).  Plaintiff has abandoned his claim against Dowd (Doc. 87 at 1). Plaintiff's claims against Jane/John Doe were never pursued.

harm after he was informed of Plaintiff's verbal altercation with Silva and of an inter-office memo that stated that Silva had been overheard talking with other inmates about killing Plaintiff.  Finally, Plaintiff alleges that Stroop was aware that Silva desired retaliation against Plaintiff's wife (Doc. 87 at 4).

In his claim against defendant Michael Bibb ("Bibb"), Plaintiff alleges that Bibb, who was Osceola County Jail's Security Administrator at the time of the incident, failed to take steps that could have averted Plaintiff's physical altercation with Sanchez (Doc. 1 at 9). Plaintiff alleges that Bibb was aware that Silva posed a risk of harm to Plaintiff and that Bibb breached his duties by failing to take actions to protect Plaintiff (Doc. 87 at 6).

Defendants Dowd, Almonte, Stroop and Bibb filed a motion for summary judgment (Doc. 75).   In the motion, Defendants argue that they are entitled to summary judgment because: (1) Plaintiff has failed to establish a constitutional violation; (2) Plaintiff has failed to establish supervisory liability on behalf of Defendant Bibb; (3) Defendants are entitled to qualified immunity pursuant to 42 U.S.C. § 1983; (4) Plaintiff is not entitled to punitive damages for any constitutional violations because he cannot show malice on Defendants' part; and (5) Plaintiff failed to exhaust his administrative remedies and the complaint must be dismissed pursuant to the Prisoner Litigation Reform Act. *Id.* at 10-24.  Plaintiff filed an amended response to the motion for summary judgment in which he argues that Defendants' responses to the threats posed by co-defendant and fellow inmate Silva were not reasonable (Doc. 87).  Petitioner also asserts that a grievance filed after the attack provided notice of the basis for the suit and as a result, summary judgment for failure to exhaust remedies is not warranted *Id.* at 23.

In support of their motion for summary judgment, Defendants submitted numerous

documents, including Plaintiff's deposition, each defendant's individual affidavit, and memos and reports regarding incidents leading up to the physical altercation between Plaintiff and Sanchez (Doc. 75 at Ex. 1-9).  Similarly, Plaintiff has submitted documents in opposition to Defendants' motion, including the Defendants' individual interrogatory responses, medical records, sworn statements, incident reports, and affidavits of Mario Gonzalez, Yicett Feliciano, and Jonathon Ortiz (Doc. 78 at Ex. 1).[2]  The factual details regarding the incidents that Plaintiff alleges led to his stabbing are discussed below.[3]

## II.    Factual Background

On February 8, 2007, Plaintiff entered the Osceola County Jail ("Jail") as a pretrial detainee (Doc. 1 at 10).  The Jail is comprised of four units: B-Pod, C-Pod, D-pod, and F-Pod. Plaintiff was classified as a maximum security inmate (Stroop Aff. at ¶ 9).  On March 22, 2007, Plaintiff's co-defendant Sharif Silva ("Silva") was arrested and transported to the Osceola County Jail.  Id. at ¶ 10.  On April 14, 2007, Plaintiff was reassigned to the same housing pod as Silva (Doc. 1 at 11; Stroop Aff. at ¶ 12).  Because of a court order requiring Plaintiff and Silva to be housed separately, both inmates notified jail staff and wrote sworn statements that they could not be housed together ( Doc. 1 at Ex. A).  Plaintiff did not mention gang activity or claim that he was afraid of Silva or Sanchez at that time (Plaintiff's Depo. at

---

[2] Plaintiff's original response to Defendant's motion for summary judgment was stricken at Plaintiff's request (Docs. 84, 85).  However, also at Plaintiff's request, the exhibits to Plaintiff's initial response are considered in the disposition of this motion (Doc. 85 at 2). Plaintiff submitted an untimely supplemental affidavit on May 9, 2011 (Doc. 94). The affidavit merely re-argues the points of Plaintiff's Amended Response (Doc 87).

[3] For clarity, citations to depositions, affidavits, and the corresponding exhibits will be by name instead of docket number, i.e. (Plaintiff's Depo. at page number). Defendants' exhibits are attached to their motion for summary judgment (Doc. 75 at Ex. 1-9).  Plaintiff's exhibits are attached to his original response (Doc. 78 at Ex. 1).

29).  An incident report regarding the housing status was generated.  *Id*.  On April 14, 2007, Plaintiff was moved to F-B pod pending classification review.  *Id.* at 12.  Plaintiff was then placed in C-D Pod and on April 19, 2007, Plaintiff was re-housed to F-C Pod.  *Id*.  A "Keep Away From" order was entered into jail records regarding Plaintiff and Silva, directing that the two inmates be isolated from one another (Stroop Aff. at ¶ 12).

On April 19, 2007, Plaintiff requested that he be moved back to C-D Pod.  Plaintiff's request did not indicate that he was afraid of Silva or of Silva's associates, but it did indicate that he wanted to move back to C-D pod before he got into trouble and in order to avoid conflict with Officer Little.[4] (Doc. 1 at Ex. B). Plaintiff received a response to his request from Defendant Stroop indicating that he was correctly housed.  *Id*.

Plaintiff subsequently received a disciplinary report and was placed in the C-C Pod, a confinement unit.  *Id*.  Plaintiff alleges that on the evening of May 20, 2007, Silva manipulated a jail officer into escorting him to C-E Pod, a high-risk segregation unit, where Silva was housed (Doc. 1 at 13; Plaintiff's Depo. at 31). A verbal altercation between Plaintiff and Silva ensued during which Silva threatened to kill Plaintiff (Doc. 1 at 13).  This was the first time Plaintiff became concerned about his safety as it related to Silva (Plaintiff's Depo. at 31).  On May 21, 2001, Plaintiff filed a grievance regarding the incident.[5]

_____

[4] Officer Little is not a party to this action.

[5] Plaintiff's grievance stated:

On 5-20-07 at 10 p.m., Officer Ruiz called me out my cell[,] CC/A lookdown. He asked me if I knew Sharif Silva & escorted me to CE were I was confronted by Sharif Silva.  He was belligerent and threatened to kill me when he got out of the box CE.  It is court ordered that Sharif Silva and I stay away from each other.   There were two inmates present when Silva threatened me.  One I know & the other I've seen around; the one I don't

Defendant Almonte investigated Plaintiff's grievance by interviewing Plaintiff, Silva, the control room officer, and the officer Plaintiff claimed had escorted him to Silva's cell. Both the officer and Silva told Almonte that Plaintiff visited Silva's cell without an escort (Almonte Aff. at ¶ 5). She determined that no other inmates could have witnessed the altercation *Id*. In her response to the grievance, Almonte wrote that "[b]ased on the preponderance of the evidence, the information obtained was that you entered CE unsecured and proceeded to engage into an argument with I/M Silva. [Officer] Ruiz [was] later counseled on the matter of entering CE unauthorized." (Doc. 1 at Ex. C). The receipt at the bottom of the grievance indicates that it was forwarded to Defendant Bibb. *Id*.

On May 31, 2007, the corrections mail-room received an anonymous report that Silva planned to kill Plaintiff on July 5, 2007 (Bibb Aff. at ¶ 6, Ex. B). An email was sent to Bibb, Almonte, and Stroop confirming that Plaintiff and Silva were currently housed in separate units and noting that Keep Away From orders were in place for the inmates (Bibb Aff. at Ex. B). The email also suggested that the inmates be kept apart at the courthouse and that other inmates be kept away from Plaintiff and Silva on court days "so that no one passes any weapons to either one of them." *Id*. Silva and his cell were subsequently searched for contraband, but no contraband was found (Bibb Aff. at ¶ 6). Plaintiff was not informed of this anonymous report (Doc. 87 at 13).

---

know is gang related. Officer Ruiz & his partner were both present. Officer Ruiz put my life in danger. I have notified my family as well as my attorney. I [believe] Sharif Silva manipulated Officer Ruiz into bringing me over to CE. I also have several witnesses at CC that [saw] when Officer Ruiz asked me to get [dressed and] come out [of] my cell.

(Doc. 1 at Ex. C).

On June 9, 2007, metal rods were discovered in Silva's mail and a search of Silva's cell located two razor blades (Bibb Aff. at ¶ 7).  As a result, Plaintiff was placed in medical isolation for two days for his protection. *Id.* at ¶ 8.  Plaintiff was called into Bibb's office and advised that he had been placed in medical isolation because jail staff had determined that Silva might present a threat to him (Plaintiff's Depo. at 66-67).

On July 21, 2007, Plaintiff wrote a sworn statement advising that Silva had passed notes to his Nieta[6] friends that contained the name of Plaintiff's wife.[7] (Almonte Aff. at Ex. B). An incident report was generated indicating that Plaintiff told an officer that inmate Christian Ramirez had been given a note by Silva and that Silva wanted retaliation against Plaintiff's wife because she was a witness in the case against Silva and Plaintiff. *Id*.  A search was made of Ramirez' property, but no note or contraband was found. *Id*.

The affidavits of Plaintiff's fellow inmates, Mario Gonzales and Jonathan Ortiz, indicate that they received orders from Silva to kill Plaintiff, but that they refused to act on the orders (Doc. 78 at Ex. 19).[8]  Gonzalez was a gang associate of Silva and was also Plaintiff's cell mate while he was incarcerated at the Osceola County Jail (Gonzalez Aff. at ¶¶ 5,6). Jail staff was not informed of these orders from Silva, although Gonzales indicates that he witnessed jail staff tell Plaintiff to "be careful and watch himself." (Doc. 78 at Ex. 19).  Gonzales states

---

[6] Plaintiff alleges that Silva was a member of the Nieta gang (Almonte Aff. at Ex. B).

[7]References to threats made against Plaintiff's wife are to threats against his girlfriend at the time, Yicett Feliciano (Plaintiff's Depo. at 20).

[8]Gonzalez' affidavit indicated that he received the order when Plaintiff moved to F-C pod, but contains no specific dates (Gonzales Aff. at ¶ 7).  Although unclear, Ortiz' affidavit indicates that he was incarcerated with Silva in 2008, after the date of the incident at issue (Ortiz Aff. at ¶ 1).

that he informed Plaintiff of the order from Silva, but that he also told Plaintiff that he would not act on the order (Gonzalez Aff. at ¶¶ 5,6).  Plaintiff did not object to being housed with Gonzales and did not inform anyone at Osceola County Jail that he was concerned about housing with him or that Silva had issued an order for Gonzalez to kill him (Plaintiff's Depo. at 79).

Prior to July 27, 2007, Plaintiff had been housed with Eduardo Sanchez in C-A pod without incident (Plaintiff's Depo. at 44; Doc. 87 at 13).  Plaintiff and Sanchez never disagreed about anything while they were housed together (Plaintiff's Depo. at 45).  Although Sanchez was not a member of Nieta, Plaintiff knew that Sanchez and Silva were associated because they were from the same place in Puerto Rico. *Id*. at 46.  Furthermore, Plaintiff had observed Sanchez "hang out" with Silva's associates and he knew from other prisoners that there was a connection between Silva and Sanchez. *Id.* at 49, 59.  However, Plaintiff did not inform anyone at Osceola County Jail of an affiliation between Silva and Sanchez. *Id*. at 59.

On July 27, 2007, Plaintiff was moved from C-A pod to F-C pod. *Id.* at 42.  Shortly after entering F-C pod, Plaintiff was attacked by Sanchez who stabbed Petitioner three times in the head with a pencil (Doc. 1 at 16).  Corrections officers were forced to administer chemical agents to separate Plaintiff and Sanchez. *Id*.  After the attack, Plaintiff was taken to the jail's medical facility where he was treated for superficial stab wounds to his scalp (Doc. 78-1 at 68; Doc. 87 at 14).  Plaintiff received twenty days disciplinary confinement as a result of the altercation (Doc. 78-1 at 64).

On August 1, 2007, Plaintiff filed a grievance report regarding the altercation with Sanchez.  Plaintiff's report did not inform the jail that he believed the attack was prompted by Silva or by a gang affiliation:

On 7-27-07, I was moved from CA to FC.  I told Cpl. Gonzales that I had problems there: every time I was moved there!  I wrote a sworn [statement] against Ms. Little.  Both times I went to FC she put me in the [unintelligible].  I wrote grievances about Ms. Little with no avail!  What I got back was a memo from Cpl. Sorrell saying how professional she [sic] and that she would never abuse her authority.  Cpl. Gonzales contacted classification and told the heavy set white lady.  Five minute after getting to FC I was escorted in hand cuffs.  Cpl. Gonzales and I were passing classification office and we saw the lady that moved me.  He told her you see, and all she did was hiss as if to say she didn't care.  I have never had problems the jail [sic]; but every time I'm moved from C side I just happen to get DR!  To my knowledge Ms. Little is under investigation.

I don't want to cause any problems but I feel classification is to blame for what happened to me on 7/27/07.  I was stabbed with a pencil 3 times.  Doctor had to take out the lead and put it in a gauze for evidence.  I've contacted my family as well as my lawyer.  I have also complained about this matter to classification in the past and all they said was that I was properly [housed].  They also made a mistake a while back and put me in DA with my co-defendant.  Isn't the jail supposed to provide a safe secure environment for inmates?

(Stroop Aff. at Ex. B).  Defendant Stroop responded to the grievance and advised Plaintiff that "your behavior is the reason for your housing.  You are now pending a D.R." *Id*.

On August 20, 2007, Plaintiff's attorney moved to have Plaintiff housed in the Orange County Jail pending trial (Doc. 78-1 at 71).  The motion stated that "since [Plaintiff's] time in the Jail, [he] has received death threats from his Co-Defendant Sharif Silva, has been attacked and stabbed in the back of his head, and has been forced to remain in isolation (protective custody) periodically for his own safety." *Id*.  On August 22, 2007, Plaintiff was moved to the Orange County Jail (Stroop Aff. at ¶ 21).

In order to attend court proceedings related to his February 2007 arrest, Petitioner returned to Osceola County Corrections three times between December 12, 2007 and March 19, 2008. *Id*.  On December 13, 2007, the classification unit recommended that Plaintiff be placed into protective custody, but Plaintiff signed a waiver indicating that he refused to be

placed into protective custody (Stroop Aff. at ¶ 23).  Plaintiff was transferred back to Orange County Corrections on December 21, 2007. *Id.* at ¶ 24.  Plaintiff returned to Osceola County Corrections on January 7, 2008 and was placed in protective custody. *Id.* at ¶ 25.  On January 8, 2008, Plaintiff filed a grievance complaining about his segregation from the general population. *Id.* at ¶ 26.  In his grievance, Plaintiff stated that "[t]he only person I have problems with is Eduardo Sanchez.  My co-defendant Sharif Silva and I are willing to sign sworn statements saying that we don't have prob [sic]."  Plaintiff also stated that he was not afraid of any danger and indicated that he would take legal action to prevent Osceola County from placing him into protective custody (Doc. 65-1 at 16).  In response to the grievance, Defendant Stroop stated that "Your housing is based on a credible threat made against you and will remain based on our responsibility to serve and protect." *Id.*

In his deposition, Plaintiff stated that he had lied in the January 8, 2008 grievance regarding Silva and regarding his indication that he did not understand why he was being placed into protective custody (Plaintiff's Depo. at 63-65).  Plaintiff explained that the January 8, 2008 grievance was a tactical move in order to get Osceola County Corrections to admit that they were aware of a potential danger against him and that he had never actually spoken with Silva regarding any problems he might have had with him. *Id.*

III.   **Legal Standards**

   *a.*   ***Summary Judgment***

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law." Fed.R.Civ.P. 56(c).[9]  The Court must view the documents in the light most favorable to the non-moving party, and the documents must show that the non-moving party is not entitled to relief under any set of facts alleged in the complaint.  *See generally*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997); *Jeffery v. Sarasota White Sox*, *Inc.*, 64 F.3d 590 (11th Cir. 1995).  If the record presents factual issues, the court must not decide them, it must deny the motion and proceed to trial. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Johns v. Jarred*, 927 F.2d 551, 555 (11th Cir. 1991).  A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once the movant presents evidence which, if not controverted, would entitle the movant to a directed verdict at trial, the burden shifts to the non-moving party to assert specific facts demonstrating that there is a genuine issue for trial. *Id.* at 250.

If a defendant in a civil case moves for summary judgment based on the lack of proof of a material fact, the court must determine whether a fair minded jury could return a verdict for the plaintiff on the evidence presented. *Anderson*, 477 U.S. at 252.  The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  *Id.*

### b.    Qualified Immunity

---

[9]  Federal Rule of Civil Procedure 56 was revised, effective December 1, 2010. However, the standard for granting summary judgment remains unchanged. Fed. R. Civ. P. 56 comm. n. (2010).

Disputes over genuine issues of material fact will not "preclude summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988).  Public officials performing discretionary functions which objectively appear to be within the official's authority have qualified immunity from § 1983 liability if their challenged conduct did not violate a clearly established constitutional right of which a reasonable person would have known given the circumstances and information possessed by the official at the time of the conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 815-819 (1982). Qualified immunity is designed to allow officials who are entitled to immunity to avoid the expense and disruption of going to trial, and is not merely a defense to liability. *Ansley*, 925 F.2d at 1345.  Qualified  immunity is a question of law for the court to determine. *Id.* at 1341.

The objective-reasonableness test described in *Harlow* is a two part analysis. First, the defendant public official must prove that he was performing duties within the scope of his discretionary authority when the alleged violation occurred. *Hutton v. Strickland*, 919 F.2d 1531, 1537 (11th Cir.1990) (citations omitted).  A government official may prove that he was acting within the scope of his authority by showing facts and circumstances that indicate that his actions were part of his normal job duties and within the scope of authority delegated to him by his employer.

Once the defendant proves that he was acting within his discretionary authority, the burden shifts to the plaintiff to prove that the defendant did not act in good faith and is not entitled to qualified immunity. *Hutton*, 919 F.2d at 1537. The plaintiff may meet this burden by establishing that the defendant's actions violated clearly established constitutional law.

-12-

*Id.*  This second prong of the objective-reasonableness test has two sub-parts. *Id.* at 1538. A court making a qualified immunity analysis must determine: 1) whether the facts alleged taken in the light most favorable to the party asserting the injury show that the defendant's conduct violated a constitutional right; and 2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001) (modified by *Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that the analysis need not be taken in any particular order)).  For the law to be so clearly established that qualified immunity does not apply, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelter*, 526 U.S. 730, 739 (2002).  In other words, in light of the pre-existing law, the unlawfulness must be apparent. *Id.*

**IV.**   **Analysis**

   **a.**    ***Plaintiff Has Failed to Establish a Constitutional Violation***

   The failure of prison officials to control or separate prisoners who endanger the physical safety of other prisoners may, under certain conditions, constitute an Eighth Amendment deprivation. *Smith v. Wade*, 461 U.S. 30 (1983). The same protections are afforded to pretrial detainees under the Due Process Clause of the Fourteenth Amendment. *DeShaney v. Winnebago County DSS*, 489 U.S. 189, 199 (1989).   However, an inmate's constitutional rights are not violated every time he is injured as a result of another inmate's actions.  For Defendants to be liable for a constitutional violation, Plaintiff must show that the conditions under which he was incarcerated presented "a substantial risk of serious harm" to him, to which Defendants responded in an objectively unreasonable manner. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)*; Marsh v. Butler County*, 268 F.3d 1014, 1028-29 (11th

Cir. 2001).

An analysis of whether conditions presented a substantial risk of harm to a plaintiff has both an objective and a subjective component.   First, the defendants must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists.   Next, the official must actually draw the inference. *Farmer*, 511 U.S. at 837.   The Supreme Court has emphasized that Eighth Amendment liability requires a showing that the responsible official was subjectively conscious of risk to the inmate. In other words, merely proving that the official "should have known" of the risk to the inmate is insufficient because actual knowledge is required:   "the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, *and he must also draw the inference*." *Farmer*, 511 U.S. at 837 (emphasis added). Accordingly, summary judgment in favor of prison officials is appropriate absent evidence of the officials' knowledge of a risk and threat to the prisoner prior to the attack.   *Pogue v. Bello*, 275 F.3d 1079 (5th Cir. 2001); *LaMarca v. Turner*, 995 F.2d 1535, 1536 (11th Cir.1993).

The prison official who ignores a substantial risk of serious harm to an inmate must have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834. A culpable state of mind is one of "deliberate indifference" to the inmate's health or safety. *Wilson v. Seiter*, 501 U.S.294, 297, 302 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976). Traditionally, authorities have described "deliberate indifference" as a state of mind more blameworthy than mere negligence, or even gross negligence, and more than a lack of ordinary due care for a prisoner's safety. *Whitley v. Albers*, 475 U.S. 312, 106 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986); *Estelle*, 429 U.S. at 104; *Parker v. Williams*, 862 F.2d 1471 (11th Cir.1989).

Thus, when a plaintiff fails to offer proof of serious misconduct, what may ordinarily be a common law tort is not a constitutional violation actionable under § 1983. *Rhodes v. Chapman*, 452 U.S. 337, 347(1981); *Estelle*, 429 U.S. at 106.

Finally, there must also be an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation. *LaMarca*, 995 F.2d at 1536.  While personal participation is not required for a defendant to be found personally liable, the prison official must ignore a substantial risk of serious harm to the inmate which results in the harm at issue before a causal connection will be found.  *Wilson*, 501 U.S. at 298; *Estelle*, 429 U.S. at 106.

### 1.    Defendants Were Not Objectively Aware of a Substantial Risk of Serious Harm to Plaintiff

Defendants argue that, although the record establishes that corrections officers were on notice with regard to Silva, they had no information that Sanchez presented a threat to Plaintiff and as a result, Defendants were not deliberately indifferent to a threat posed by Sanchez.  Plaintiff insists that he was subjected to a substantial risk of serious harm by Silva's associates and points to several facts which Plaintiff alleges indicate that the threat to Plaintiff was not isolated to Silva.  Plaintiff asserts that: 1) the May 21, 2007 incident report regarding his verbal altercation with Silva alerted Defendants that Silva planned to have Plaintiff killed; 2) a May 31, 2007, inter-office memo indicated that Silva was conspiring with others to kill Plaintiff; and  3) the search of Silva's cell which yielded two razor blades and metal rods indicated that the threat to Plaintiff was not solely focused on Silva (Doc. 87 at 7, 15).

Contrary to Plaintiff's assertions, these incidents do not demonstrate that Defendants had objective knowledge of a threat from Sanchez or from any of Silva's gang associates.

At most, the evidence demonstrates that Silva posed a threat to Plaintiff.  The incident report regarding the May 21, 2007 verbal altercation between Plaintiff and Silva stated only that Silva threatened Plaintiff and did not indicate that Silva threatened to have Plaintiff killed by others.[10]  The May 31, 2007 email sent to Defendants regarding Silva's conversation with other inmates did not state that Silva planned to have Plaintiff killed by his gang associates or by Sanchez.  It merely stated that Silva had been overheard talking with two other inmates about killing Plaintiff on July 5, with two knives (Doc. 78-1 at 4).  Finally, Plaintiff's assertion that Silva's possession of two razor blades should have alerted jail staff to a threat from Silva's associates is illogical because it was Silva, and not Sanchez or Silva's gang associates, who had possession of the weapons.

Furthermore, even if a gang connection to the threats against Plaintiff could be inferred from the July 21, 2007 notice in which Plaintiff told officials that he believed Nieta gang members could pose a threat against his wife, evidence of record does not establish that Sanchez was a member of Nieta.  Plaintiff asserts that Silva and Sanchez were affiliated because they were from the same place in Puerto Rico and they knew each other.  He also asserts that Sanchez was a member of a Nieta "brother" gang and that he had observed Sanchez "hanging out" with Silva's associates.  However, Plaintiff and Sanchez had been housed together for several weeks prior to July 27, 2007, and Plaintiff admitted that they never had a disagreement.  Furthermore, Plaintiff was housed in the same cell as Nieta member Mario Gonzales without incident. As such, record evidence does not establish any

_____

[10]The grievance did state that Officer Ruiz, Ruiz' partner, and two other inmates were present when Silva's threat was made.  However, the grievance did not indicate that Plaintiff was afraid of the other inmates, Officer Ruiz, or his partner.

basis to conclude that Sanchez posed a substantial threat to Plaintiff.

Although this Court is required to draw all reasonable inferences in favor of the party opposing summary judgment, those inferences must be based on facts in the record.  The Court is not permitted to deny a summary judgment motion based on unreasonable inferences that amount to nothing but speculation or conjecture. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The Eleventh Circuit has noted that "[t]he known risk of injury must be a strong likelihood, rather than a mere possibility before a guard's failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.1990) (citations and internal quotations omitted).  Plaintiff is unable to demonstrate Defendants' appreciation of a known risk of injury from any inmate other than Silva.  Plaintiff has failed to show sufficient specific facts to establish that Defendants could have drawn an inference that Eduardo Sanchez posed a substantial risk of serious harm to Plaintiff. *See Anderson*, 477 U.S. at 252.

### 2.      Defendants Were Not Subjectively Aware of a Substantial Risk of Serious Harm to Plaintiff

Even if Defendants should have realized that the threat to Plaintiff was not isolated to Silva, the record on summary judgment does not indicate that Defendants were subjectively aware of a substantial risk from Sanchez or from Silva's gang associates.  Under the *Farmer* test, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Failure to protect from an objectively significant risk that should have been, but was not, perceived, is not an Eighth Amendment violation. *Id*.

Plaintiff argues that Defendants were subjectively aware of a general threat because

Plaintiff was placed in isolation after weapons were found in Silva's cell and after Silva was locked up, demonstrating that "Defendants were aware that an inference was drawn that even though Silva was locked down[,] a threat still existed." (Doc. 87 at 15).  Defendant Bibb admits that as a result of finding metal rods in Silva's mail and two razor blades in his Bible, Plaintiff was placed in protective isolation for two days (Bibb Aff. at ¶ 8).  However, Plaintiff does not point to any specific record evidence indicating that Defendants were aware that Plaintiff was in danger from Sanchez or from Silva's gang associates or that any danger to Plaintiff extended past the two days he was in isolation.  Moreover, Plaintiff offers no record evidence suggesting that the defendants subjectively believed his two-day removal from the prison's general population was necessary to protect him from Silva's associates, as opposed to Silva.[11]  As noted above, Plaintiff had been housed with both Sanchez and with a Nieta gang member without incident prior to July 27, 2007.   Plaintiff's subjective belief about why Defendants placed him in protective custody for two days, without facts to support his belief, are simply insufficient to create a genuine issue of fact. Fed. R. Civ. P. 56(c); *Ellis v. England*, 432 F.3d 1321, 26 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion").

Finally, although not dispositive on the issue, a plaintiff's failure to give notice to prison officials of a specific threat or of his fear of an inmate is relevant to the inquiry of whether a

---

[11]Plaintiff offers no evidence that Silva was actually placed on "lock down" after the weapons were discovered in his cell.  Furthermore, Plaintiff agrees that it was appropriate for corrections staff to place him in isolation after discovering the weapons so that they could "figure out what was going on." (Plaintiff's Depo. at 55).

defendant was aware of the threat. *See Carter* v. *Galloway*, 352 F.3d 1346 (11th Cir. 2003).[12]

Plaintiff neither alerted Defendants to the alleged association between Silva and Sanchez nor

alerted jail officials to a gang connection regarding Silva's threats against him, even though

Mario Gonzales informed Plaintiff that he had been ordered by Silva to kill him.   Although

Plaintiff was aware that Silva and Sanchez were acquainted, were from the same town in

Puerto Rico, and were members of "brother gangs," Plaintiff did not inform Defendants that

Sanchez posed a threat because he felt he had no reason to do so (Plaintiff's Depo. at 59).

Because Plaintiff did not inform Defendants of these threats, they were aware only of Silva's

issues with Plaintiff.   A generalized awareness of a risk from Silva, or even from his

associates, does not satisfy the subjective awareness requirement of a specific threat from

Sanchez. *See Carter*, 352 F.3d at 1350.

### 3.      Defendants' Responses Were Objectively Reasonable

Even if this Court accepts for summary judgment purposes that the record supports

an objectively substantial risk of serious harm from Sanchez, and even assuming *arguendo*

that Defendants drew the requisite inferences from known facts, no Eighth Amendment

constitutional violation is shown unless Defendants' response to the risk was objectively

unreasonable. *Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial

---

[12]   In *Carter*, the Eleventh Circuit determined that a prison official's general awareness of a risk does not satisfy the subjective awareness requirement. 352 F.3d at 1349.  Prior to being attacked by his cell mate, the plaintiff in *Carter* informed jail staff that his cell mate was  "acting crazy and planned on faking a hanging," but did not inform staff that he feared his cell mate or that the cell mate had made a specific threat against him. Furthermore, the plaintiff did not request protective custody. The Eleventh Circuit determined that to assume the defendants actually made an inference that the plaintiff's cell mate was a threat to him was to "assume too much." *Id.* at 1350.  Rather, before a defendant's "awareness arises to a sufficient level of culpability, there must be much more than mere awareness of [an attacker's] generally problematic nature." *Id.* at 1349-50.

risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). A prison official responds to a known risk in an objectively unreasonable manner if "he knew of ways to reduce the harm but knowingly declined to act" or if "he knew of ways to reduce the harm but recklessly declined to act." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir. 1995). Defendants' responses to threats from Silva and his associates are discussed below.

Plaintiff states that he became afraid of Silva for the first time on May 20, 2007 because of the verbal altercation with Silva in which he threatened to kill Plaintiff.[13] Plaintiff argues that if Defendant Almonte had done a more thorough job of investigating his verbal altercation with Silva, Plaintiff would have been placed in protective custody at that time (Plaintiff's Depo at 57). In response to the grievance filed by Plaintiff after the verbal altercation with Silva, Almonte interviewed Plaintiff, Silva, the control room operator, and the corrections officer who had allegedly escorted Plaintiff to Silva's cell. She concluded that Plaintiff had entered the area of Silva's cell unescorted and in violation of jail policy. Plaintiff argues that it was unreasonable for Almonte to conclude that he entered Silva's cell block unescorted. However, even if Almonte should have done a more thorough investigation of

---

[13] It is clear from the record and neither party disputes, that neither Silva nor Sanchez presented a risk to Plaintiff prior to Plaintiff's May 21, 2007 verbal altercation with Silva. Therefore, the prison's original mis-classification of Silva in which he was housed in the same dormitory as Plaintiff and Plaintiff's April 19, 2007 inmate request in which he asked to be moved back to C-D block are irrelevant to the analysis of whether Defendants acted reasonably in responding to a threat from Silva or his associates (Doc. 75 at 11).

Likewise, although Defendants enumerate actions taken by jail officials to protect Plaintiff from Silva and his associates after the July 21, 2007 attack which is the subject of this civil action, these actions are not relevant to whether Defendants acted reasonably to prevent the attack and will not be considered by this Court for that purpose.

the May 20, 2007 incident, a finding not made by this Court, her behavior was, at most, negligent.  Merely negligent failure to protect an inmate from attack does not demonstrate deliberate indifference and does not establish liability under § 1983. *Carter*, 352 F.3d at 1350.

In response to a May 31, 2007 anonymous request form advising that Silva had been overheard planning to kill Plaintiff, "Keep Away From" orders for Plaintiff and Silva were confirmed and Silva and his cell were searched for contraband.  An email was distributed to Defendants Bibb, Almonte and Stroop confirming that Plaintiff and Silva were currently housed in separate units and noting that Keep Away From orders were in place for the inmates.  The email also suggested that Plaintiff and Silva be kept apart at the courthouse and that other inmates be kept away from Plaintiff and Silva on court days "so that no one passes any weapons to either one of them."  Plaintiff argues that, after this email was distributed, Almonte's failure to inform other staff of the danger posed by Silva, "on the heels" of his grievance regarding the verbal altercation, demonstrates callous indifference on her part (Doc. 17 at 16-17).  However, the record contains no indication that Almonte or any other staff was aware of any danger posed by Sanchez or any other Silva associate at that time.

In response to a June 9, 2007 search of Silva's cell in which razor blades were found in Silva's cell and a shank was found in his mail, Plaintiff was placed into protective medical isolation for two days.  In response to Plaintiff's complaint that Silva had passed a note to inmate Ramirez containing the name of Plaintiff's wife, Ramirez' property was searched, but no note or contraband was found.  During the period at issue, Keep Away From orders were issued in regard to Plaintiff and Silva on April 15, 2007,  May 25, 2007, and July 31, 2007.[14]

---

[14] The April 15, 2007 order was issued because Plaintiff and Silva were co-defendants and not in response to any threat from Silva.

Keep Away From orders were also issued as to Plaintiff and co-defendant Marino Gomez-Leon; inmate Robert Thomas who was the victim of the crime with which Plaintiff was charged; Silva's step-brother after corrections staff learned that he had threatened Plaintiff; and inmate Jarre Moore.  Keep Away From orders were issued as to Eduardo Sanchez after the July 27, 2007 incident.

Plaintiff does not allege that these actions were unreasonable.  Rather, he argues that because Silva could improperly influence other inmates, it was unreasonable for Defendants to allow Silva and Plaintiff to return to the open population of the jail after Defendants learned of Silva's desire to harm Plaintiff (Doc. 87 at 62 and 69).  He further argues that Defendants' failure to recognize a risk from Silva's associates demonstrates Defendants' callous indifference to a serious risk of harm (Doc. 87-16-17).

As discussed above, returning Silva to the general population was unreasonable only to the extent that Defendants were subjectively aware that doing so would allow Silva to persuade his associates to harm Plaintiff.  While it is true, in hindsight, that keeping Plaintiff in protective custody throughout his time at the Osceola County Jail would have prevented the July 27, 2007 incident, "[w]e will not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment." *Purcell ex rel. Estate of Morgan v. Toombs County, GA*, 400 F.3d 1313, 1320 (11th Cir.2005).  Even if Defendants arguably should have placed Plaintiff into protective custody, "merely negligent failure to protect an inmate from attack does not justify liability under section 1983[.]" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir.1990).

Moreover, this Court is aware that other prison interests must factor into the calculus of reasonable responses. *See Chandler v. Crosby*, 379 F.3d 1278, 1290 (11th Cir.2004) ("As

judges, we lack carte blanche to impose our own theories of penology on the nation's prisons." (Internal citation and quotation omitted)). A prison official's duty under the Eighth Amendment is to ensure "reasonable safety", a "standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*, 511 U.S. at 845 (internal citations omitted).

Plaintiff has failed to show that Defendants' actions constituted an indifferent and objectively unreasonable response to threats against him. This Court concludes that Plaintiff has failed to present sufficient facts such that a fair minded jury could determine that Plaintiff has established a constitutional violation. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims as a matter of law. *See Anderson*, 477 U.S. at 252.

### b.   Defendants are Entitled to Qualified Immunity

Even had Plaintiff presented sufficient facts to allege a violation of a constitutional right, and on this record he has failed to do so, a claim of qualified immunity is distinct from the merits of a plaintiff's claim that his rights have been violated. *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). Defendants argue that they are entitled to qualified immunity because they were engaged in legitimate job-related functions in an authorized manner when they investigated Plaintiff's grievances, made decisions with regard to Plaintiff's classification, and placed Plaintiff in medical isolation (Doc. 75 at 22). They argue that Plaintiff has not met his burden of establishing that Defendants' conduct violated a clearly established constitutional right of which a reasonable person would have known given the circumstances and information possessed by Defendants at the time of the conduct. *Id.* This Court agrees.

It is undisputed that Defendants were performing duties within the scope of their

discretionary authority when the alleged violation occurred.  Defendant Almonte acted in her capacity as a supervising officer when she investigated Plaintiff's May 21, 2007 grievance regarding his verbal altercation with Silva and when she investigated the July 22, 2007 report from Plaintiff that Silva had passed a note to Ramirez containing the name of Plaintiff's wife. Defendant Bibb acted in his capacity as a security administrator when he had Silva's cell searched for contraband after learning of Silva's threats against Plaintiff.  Defendant Bibb also acted in his discretionary authority when he placed Plaintiff in protective medical isolation to protect him from Silva.  Defendant Stroop acted in his capacity as classification manager when he issued Keep Away From orders regarding Plaintiff and several other inmates, including Silva.  Stroop also acted in his discretionary authority when he responded to Plaintiff's grievances regarding classification. It is clear from the facts and circumstances shown by Defendants that the actions complained of by Plaintiff were part of Defendants' normal job duties and within the scope of authority delegated to them by their employer. *See Rich*, 841 F.2d at 1564 (government official can prove that he acted within the scope of his discretionary authority by showing "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.").

Defendants have carried their burden of showing that they were acting within their discretionary authority.   In addition, this Court finds that Plaintiff has not shown that Defendants violated clearly established law at any time relevant herein. *See* discussion, *supra* Part IV. Thus, the doctrine of qualified immunity bars plaintiffs' claims against Defendants in their individual capacities and Defendants are entitled to summary judgment as a matter of law. *See Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were

the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## V.     Conclusion

The Court finds that Defendants Denis Dowd, Wm. Michael Bibb, Mark Stroop, and Yuberky Almonte are entitled to summary judgment as a matter of law on Plaintiff's claims.

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.   Defendants' Motion for Summary Judgment (Doc. 75, filed September 24, 2010) is **GRANTED**.   Defendants Denis Dowd, Wm. Michael Bibb, Mark Stroop and Yuberky Almonte are entitled to summary judgment as a matter of law on Plaintiff's claims.

2.   The Clerk of Court is directed to enter a judgment in favor of Defendants and against Plaintiff.

3. The Clerk of Court is directed to close this case.  All pending motions are **DENIED** as moot.

**DONE** and **ORDERED** at in Chambers at Orlando, Florida, this 28th day of June 2011.

Copies to:
OrlP-4 6/28
Jorge Luis Concepcion
Counsel of Record

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE